=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 156
Paul M. Ellington,
          Appellant,
        v.
EMI Music, Inc., et al.,
          Defendants,
EMI Mills Music, Inc.,
          Respondent.




          Richard J. J. Scarola, for appellant.
          Donald S. Zakarin, for respondent.




ABDUS-SALAAM, J.:

          In this breach of contract action, we have been asked

to interpret the terms of a royalty provision contained in a 1961

United States copyright renewal Agreement between the legendary

Edward Kennedy "Duke" Ellington (Duke Ellington)and Mills Music,

- 1 -

Inc. (now EMI).  We hold that the disputed terms of the Agreement are clear and unambiguous.  Thus, we affirm the Appellate Division.

## I.

Plaintiff Paul Ellington, an heir and grandson of Duke Ellington, commenced this breach of contract action to recover royalties allegedly due under a royalty provision contained in a copyright renewal agreement dated December 17, 1961.  The Agreement designates Duke Ellington and named members of his family as the "First Parties."  The Agreement is expressly binding upon all of Duke Ellington's heirs and assigns.  The Agreement defines "Second Party" as consisting of a group of music publishers including Mills Music, Inc. (whose successor in interest is respondent EMI) as well as "American Academy of Music, Inc., Gotham Music Service, Inc. and their predecessors in interest, and any other affiliate of Mills Music, Inc." (Agreement, preamble).

The Agreement assigned to the Second Party the right to renew the United States copyright to certain musical compositions written by Duke Ellington, specified in Schedules 1, 2, and 3 of the Agreement, subject to the payment of royalties.  Accordingly, the music publishers designated as the Second Party owned the copyright to the relevant compositions and were required to renew

the copyrights on behalf of Duke Ellington.  Specifically, the Agreement states that Duke Ellington confirms that, "Mills Music, Inc., American Academy of Music, Inc., and Gotham Music Service, Inc., or any of their predecessors in interest or any other affiliated companies of Mills Music, Inc., not specifically mentioned, were and are now possessed of and are entitled to the original copyrights of the [relevant] musical compositions" (Agreement,¶5).

Paragraph 3(a) of the Agreement, the royalty provision at issue, requires the Second Party to pay the First Parties "a sum equal to fifty (50%) percent of the net revenue actually *received* by the Second Party from . . . foreign publication" of the relevant musical compositions (Agreement, ¶3 [a] [emphasis added]).  This type of provision is known as a "net receipts" arrangement under which a composer, such as Duke Ellington, would collect royalties based on income received by a publisher after the deduction of fees charged by foreign subpublishers (see e.g. Jobim v Songs of Universal, 732 F Supp 2d 407, 413 [SD NY 2010]).  At the time the Agreement was executed, foreign subpublishers were typically unaffiliated with domestic music publishers.  Recently, however, many domestic publishers, including EMI, have affiliated with foreign subpublishers and it is this development that forms the basis of plaintiff's claim of breach of contract.

Pursuant to limited audit rights allowed by contract, plaintiff requested an audit of EMI.  During the audit plaintiff

discovered that EMI had begun using affiliated foreign subpublishers, who retained 50% of the royalties generated from the foreign sale of the relevant musical compositions originally retained by the unaffiliated subpublishers. The remaining 50% was split equally between EMI and the First Parties as required by the royalty provision.

Plaintiff commenced this action against EMI alleging breach of contract and fraudulent concealment, and also requested declaratory and injunctive relief.[1] Plaintiff claimed that by using affiliated foreign subpublishers, EMI was double-dipping into the entire pot of revenue generated from the foreign sale of the relevant musical compositions. Essentially, plaintiff claims that the amount retained by the affiliated foreign subpublishers prior to remittal of the remainder to EMI is an amount received by EMI, and therefore, when using affiliated foreign subpublishers, EMI should remit to the First Parties half of the entire amount generated from the foreign sale of the relevant musical compositions. By failing to do so, he alleges that EMI has breached the Agreement by diluting his share of the royalties.

EMI moved to dismiss plaintiff's complaint pursuant to CPLR 3211 (a) (1) and (7), arguing that its method of accounting and payment is consistent with the terms and conditions of the Agreement. In opposition, plaintiff argued that the terms of the

---

[1] Plaintiff abandoned his fraudulent concealment claim.

Agreement are ambiguous and he therefore needed discovery.

Supreme Court granted EMI's motion, and dismissed the amended complaint in its entirety (Ellington v EMI, 33 Misc 3d 1209 [A] [Sup Ct, NY County 2011]). The court held that "[t]he royalty payment provision is clear and unambiguous" (id. at *4). "[T]he contracting parties made no distinction in the royalty payment terms based on whether the foreign subpublishers are affiliated or unaffiliated with the [domestic] publisher" and thus, the court determined "it would be improper at any time, but especially now, some 50 years after the date of the [Agreement]'s execution, to read such a distinction into the [Agreement]" (id.). The court also held that "[a]bsent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliates' [in the definition of Second Party] includes only those affiliates in existence at the time that the contract was executed" (id. at *5).

The Appellate Division affirmed (Ellington v EMI Music, 106 AD3d 401 [1st Dept 2013]), holding that Supreme Court "correctly determined that the [A]greement's definition of 'Second Party' included only the parties named therein and 'other affiliates of [EMI]' that were in existence at the time the [A]greement was executed," which "did not include foreign subpublishers that had no existence or affiliation with [EMI] at the time of contract" (id. at 403). This Court granted plaintiff leave to appeal (21 NY3d 865 [2013]).

II.


Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole (see Greenfield v Philles Records, 98 NY2d 562, 569 [2002]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162-163 [1990]). "The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning" (Brooke Group v JCH Syndicate 488, 87 NY2d 530, 534 [1996]; see Quadrant Structured Products Co., Ltd. v Vertin, 23 NY3d 549, 564 [2014]; J. D'Addario & Co., Inc. v Embassy Industries, Inc., 20 NY3d 113, 119 [2012]).

An agreement is unambiguous "if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion'" (Greenfield, 98 NY2d at 569, quoting Breed v Insurance Co. of N. Am., 46 NY2d 351, 355 [1978]). Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent (see Brooke Group v JCH Syndicate 488, 87 NY2d 530, 534 [1996]), or when specific language is "susceptible of two reasonable interpretations" (State of New York v Home Indem. Co., 66 NY2d 669, 671 [1985]; see Chimart

Assoc. v Paul, 66 NY2d 570, 573 [1986]).  "The best evidence of what parties to a written agreement intend is what they say in their writing . . . a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield, 98 NY2d at 569 [internal citation and quotation marks omitted]).

Plaintiff argues that two terms in the Agreement are ambiguous: (1) the phrase "net revenue actually received" in the royalty provision and (2) the term "any other affiliate" in the definition of Second Party.

A.  *"Net Revenue Actually Received"*

As stated, the royalty provision provides that the "Second Party" will pay to the "First Parties" "a sum equal to fifty (50%) percent of the net revenue *actually* received by the Second Party . . . from foreign publication" (Agreement, ¶3 [a] [emphasis added]).  This language is not ambiguous, as a plain reading of the provision indicates that plaintiff, through payment to the First Parties, is entitled to receive 50% of the net revenue actually received from foreign subpublishers.

The Agreement does not state what percentage of the net receipts generated from the foreign sale of the relevant musical compositions is to be retained by the foreign subpublishers. Rather, it states only that whatever amount EMI actually received would be split equally with the First Parties.  The Agreement

contemplates that the royalties paid to the First Parties would be based on the revenue remitted to EMI itself.  Although at the time the Agreement was executed the parties apparently did not contemplate that EMI would affiliate itself with foreign subpublishers, the percentage retained by the affiliated foreign subpublishers is not an amount actually received by EMI, but a fee for the subpublishers' services.

The royalty provision makes no distinction between affiliated and unaffiliated foreign subpublishers.  Therefore, the courts below properly declined to read such a distinction into the contract as it does not appear to have been the intent of the parties that such a distinction be included, primarily because they were understandably unaware that such a change in the industry would occur.  Nonetheless, the Agreement does not prevent EMI from using affiliated foreign subpublishers, and it does not prevent the affiliated foreign subpublishers from retaining a portion of the total sale owed to them for their services, prior to remitting the remainder to EMI.[2]  Thus, the phrase "net revenue actually received" is not ambiguous.

---

[2]  Plaintiff's argument that defendant may have breached the covenant of good faith and fair dealing by paying its affiliate foreign subpublishers rates that far exceed the market rate paid to unaffiliated subpublishers was raised for the first time in this Court, and is unpreserved.  Although the parties mentioned in their Appellate Division briefs a hypothetical case where EMI may have breached the covenant of good faith and fair dealing, plaintiff did not plead that claim and did not squarely make that claim prior to his appeal to this Court.

B.  *"Any Other Affiliate"*

The second phrase plaintiff claims is ambiguous is within the definition of Second Party.  The Agreement defines "Second Party" as consisting of a group of music publishers including "Mills Music, Inc., American Academy of Music, Inc., Gotham Music Service, Inc. and their predecessors in interest, and any other affiliate" (Agreement, preamble).  Plaintiff asserts that the affiliated foreign subpublishers are included in the term "any other affiliate."

Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term "affiliate" includes only those affiliates in existence at the time that the contract was executed (VKK Corp. v National Football League, 244 F3d 114, 130-131 [2d Cir 2001] ["The Releases's reference to 'affiliates' [is] stated in the present tense.  Nothing . . . indicates the inclusion of future rather than present members"]; Budget Rent A Car Sys. v K&T, Inc., 2008 U.S. Dist. LEXIS 73024, at *10-11 [D NJ 2008] [the exclusive license at issue was not violated here because "[n]othing in the License Agreement suggests that the parties intended the License Agreement to extend to future corporate parents or affiliates"]).

Furthermore, the parties did not include any forward looking language.  If the parties intended to bind future

affiliates they would have included language expressing that intent.  Absent such language, the named entities and other affiliated companies of EMI's predecessor which existed at the time are bound by the provision, not entities that affiliated with EMI after execution of the Agreement.  As it is undisputed that the affiliated foreign subpublishers at issue here were not affiliates at the time the Agreement was executed, they are not members of the Second Party.

Additionally, the use of present tense language in the Agreement also demonstrates that the parties intended that the Agreement would bind only affiliates in existence at the time of the Agreement.  A later clause in the Agreement states that Duke Ellington confirms that "Mills Music, Inc., American Academy of Music, Inc., and Gotham Music Service, Inc., or any of their predecessors in interest or any other affiliated companies of [EMI], not specifically mentioned, *were and are now* possessed of and are entitled to the original copyrights of the [relevant] musical compositions" (Agreement, ¶5 [emphasis added]).  This language indicates that the parties intended that the members of the Second Party were to be entities who own the copyright in the relevant musical compositions, rather than entities, who for any number of reasons, may be affiliated with the publisher.  As the affiliated foreign subpublishers do not acquire a United States copyright to the relevant compositions, the parties likely would not have intended them to be members of the Second Party.  The

role of the affiliated foreign subpublishers is simply to provide
subpublication services in their respective countries.  EMI still
retains the copyright to the relevant musical compositions.


III.


　　　We conclude that the terms "net revenue actually
received" in paragraph 3(a) and "any other affiliate" in the
definition of Second Party are not ambiguous.

　　　We note that the globalization of the music industry
has rendered this "net receipts" arrangement much more favorable
to music publishers than to artists.[3]  Nonetheless, we must
examine the parties' intentions based on the plain language
within the four corners of the Agreement.  In 1961, Ellington and
Mills Music, Inc. agreed that they would share equally the
royalties that Mills Music, Inc. actually received from the
foreign sale of the relevant musical compositions.  EMI's
corporate reconfiguration did not, as the dissent suggests,
"avoid the understanding of the parties" (dissenting op at 8).
Rather, the parties merely did not account for the possibility

---

　　[3]  According to the parties, rather than the "net receipts"
type of arrangement at issue in this case, agreements between
artists and music publishers now usually employ an "at source"
formula, under which an artist "collect[s] royalties based on a
percentage of income determined before licensing fees are
deducted" (Jobim v Songs of Universal, Inc., 732 F Supp 2d 407,
413 [SD NY 2010]).

that the publisher would eventually affiliate with foreign subpublishers.  The terms of the contract are clear and unambiguous and the Appellate Division correctly held that plaintiff has not stated a cause of action for breach of the agreement.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Paul M. Ellington v EMI Music, Inc.

No. 156

RIVERA, J.(dissenting):

I disagree with the majority that respondent EMI has carried its burden on this motion to dismiss because, in my opinion, the term "affiliate" as used in the Agreement may be interpreted as appellant suggests to include EMI's foreign affiliated entities. This reasonable interpretation of the Agreement supports a conclusion that appellant has sufficiently pled a cause of action for breach of contract. To hold otherwise, as the majority does here, forecloses appellant from pursuing his claim that EMI has avoided its obligations under the Agreement by employing music industry business models that increase revenue for publishers, to the detriment of creative artists. Therefore, I dissent.

Our review of this appeal, which is from dismissal of the complaint pursuant to CPLR 3211(A)(1) and (7), requires that we "must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord plaintiffs the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory" (Whitebox Concentrated Convertible Arbitrage Partners, L.P. v Superior Well Services, Inc., 20 NY3d 59, 63 [2012]).

- 1 -

"[T]he pleading is to be afforded a liberal construction" (Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314 [2002]; see CPLR 3026), and "[u]nder CPLR 3211(a)(1), a dismissal is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law" (Leon v Martinez, 84 NY2d 83, 87-88 [1994], citing Heaney v Purdy, 29 NY2d 157 [1971]).  Unlike on a motion for summary judgment where the court "searches the record and assesses the sufficiency of the parties' evidence," on a motion to dismiss the court "merely examines the adequacy of the pleadings" (State v Barclays Bank of New York, N.A., 151 AD2d 19, 21 [3d Dept 1989], affd 76 NY2d 533 [1990]).

The Court has previously faced questions regarding the application of existing legal doctrines to agreements which predated industry-wide developments, and has reaffirmed the vitality of traditional contract precepts in the face of even unanticipated changes.  For example, in Greenfield v Philles Records we said that, "[d]espite technological innovations that continue to revolutionize the recording industry, long-settled common law contract rules still govern the interpretation of agreements between artists and their record producers" (98 NY2d 562, 569 [2002][citation omitted]).

Under our law, where the parties to a breach of contract action dispute the intended meaning of the agreement, we look to the contract itself to determine if the terms are

unambiguous, giving the words of the contract "their plain meaning" (Quadrant Structured Products Co., Ltd. v Vertin, 23 NY3d 549, 559-60 [2014]["a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms"][citations omitted]).  If the terms are ambiguous, dismissal of the complaint under CPLR 3211 must be denied (see Telerep, LLC v U.S. Intern. Media, LLC, 74 AD3d 401, 402 [1st Dept 2010]).  Ambiguity exists when, looking within the four corners of the document, the terms are reasonably susceptible of more than one interpretation (see Greenfield, 98 NY2d at 569 [citation omitted]; Chimart Assoc. v Paul, 66 NY2d 570, 573 [1986]).

Applying these contract principles to this Agreement, and reading the complaint liberally, as the Court is required to do, I would conclude that the Agreement contains unclear and contradictory language which renders the term "affiliate" ambiguous. I would therefore reverse the Appellate Division.

At the heart of the parties' dispute is the intent of the Agreement's foreign publication royalties provision. Respondent EMI argues that under this provision the parties share the net revenues actually received, meaning the revenues that EMI receives after the costs and fees for foreign publication are deducted.  Appellant agrees, but claims that EMI has sought to garner a greater share of the revenues by using its own affiliates, rather than unaffiliated entities, to conduct the

foreign publication process.  This, appellant maintains, is in direct contravention of the intent of the parties because at the time the parties entered the Agreement they intended to share the costs and fees charged only by unaffiliated entities.

Appellant argues, and EMI concedes, that there have been changes in the manner in which publishers pursue foreign publication of creative works such as those involved in this case.  According to appellant, over time the music publishers began to use their own affiliates for foreign publication.  By so doing, the music publishers, including EMI, captured a greater share of the revenue for themselves by claiming net revenues as well as the fees formerly charged by the unaffiliated foreign entities. (See also Ira B. Selsky, Music Publishing in the International Marketplace, 17 Whittier L Rev 293, 298 [1995]). Appellant claims EMI's share comes at a cost to the Ellington Family members and their successors because EMI does not include as part of the "net revenue actually received" the revenue EMI's foreign affiliates are paid for foreign publication.

Respondent EMI contends that the only affiliates referred to in the Agreement are those of EMI's predecessor, Mills Music, Inc., which, according to EMI, cannot include foreign subpublishers.  This merely begs the question of what is an affiliate.  I find the failure to define affiliate in this Agreement indicates that the meaning is not as obvious and clear as EMI suggests, and very well supports appellant's argument that

affiliate includes foreign affiliates.

As a general matter, an "affiliate" is defined as a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation" (Black's Law Dictionary [9th ed 2009]; see also VKK v National Football League, 244 F3d 114, 130 [2d Cir 2001][defining "affiliate" as "being close in connection, allied, associated, or attached as a member or branch"], citing Black's Law Dictionary 67 [7th ed 1999]).  Nothing in this common definition suggests that an affiliate does not include a foreign affiliate.  Courts may not redefine a term to suit one party's argument, or choose to ignore the meaning generally attached to a term without some basis in the parties' agreement.  Therefore, there is an open question that cannot be answered on this motion to dismiss as to whether the parties intended to include foreign affiliates.

Respondent EMI argues, nevertheless, that, in context, the Agreement's references make clear that foreign affiliates are excluded from that term's coverage. I cannot find such absolute clarity in the text of the Agreement.  For example, although EMI asserts that the only affiliates are those of Mills Music, the Agreement does not appear to be so limited. For example, the second "Whereas" clause refers to "the Second Party or any of its affiliated companies."  If, as EMI claims, the only affiliates covered by the Agreement are those of Mills Music, there is no

need to reference affiliated companies of the Second Party, which consists of several other music publishers in addition to Mills Music. Perhaps this reference is merely redundant or superfluous; or perhaps it refers to affiliates of the other companies listed in the Preamble as "Second Party" entities.

In response to appellant's contention that EMI uses foreign subpublisher affiliates to avoid its obligations under the contract and reduce the revenues due to appellant, EMI claims that the Agreement includes only affiliates in existence at the time of the formation of the contract. However, the purpose of the Agreement, as well as the custom in the music industry, supports appellant's interpretation.

Under the Agreement, Ellington Family members transferred to the music publishers their interests in certain of Duke Ellington's creative works; works which at the time, and today, are undeniably of great creative and monetary value. In return, the music publishers agreed to provide royalties from various sales of these works, including revenues from foreign publication. Appellant argues that Duke Ellington and his family did not intend to enter an Agreement which promised them royalties, but permitted the music publishers, through corporate sleight of hand, to increase the publishers' revenues while reducing the Ellingtons' royalties.

Appellant further asserts, and EMI does not dispute, that at the time the parties entered the Agreement Mills Music

followed the general industry practice of using foreign unaffiliated subpublishers for foreign publication.  The existence of this music industry custom, understood by the parties to be the operative business model and the way things were done, supports appellant's claim that all the parties to the Agreement understood that foreign subpublishers would be used, and their fees would be discounted from the revenue. "When trade usage is widespread, there is a presumption that the parties intended its incorporation by implication, unless the contract negates this implication" (see Jobim v Songs of Universal, 732 F Supp 2d 407, 417 [SD NY 2010], citing 28 NY Prac, Contract Law § 9:25).

Respondent EMI argues that nothing in the contract prohibits it from modifying its practices and adapting to industry changes. It contends that appellant is in reality arguing to reform the Agreement from a net revenue contract to an at source contract.  This argument is simply an attempt to distract attention from the real issue in the case.  Appellant does not dispute that the foreign publication provision applies a net receipt methodology for determining royalties. Rather, he argues that EMI has manipulated the agreed-to net receipt provision to exclude revenues EMI actually receives through its foreign affiliate. The Agreement lends itself to more than one interpretation concerning the net revenue sharing provision, and appellant's interpretation seems reasonable, or at least as

reasonable as the one proposed by EMI.

As a final note, appellant's claims should give us pause because they suggest this is not, as the majority seems to believe, the unintended results of "the globalization of the music industry" that renders the Agreement "more favorable to music publishers than to artists" (majority op at 11 [footnote omitted]). Indeed, I share the concurring opinion's sense that there is something troubling about interpreting "affiliate" in the context of this Agreement, as the majority does, to include only those affiliates in existence at the formation of the contract (concurring op at 1). This interpretation sets the stage for the type of abuse alleged here, namely corporate reconfigurations that avoid the understanding of the parties.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Order affirmed, with costs. Opinion by Judge Abdus-Salaam. Judges Graffeo, Read and Pigott concur. Judge Smith concurs in result in an opinion. Judge Rivera dissents and votes to reverse in an opinion in which Chief Judge Lippman concurs.

Decided October 23, 2014